```
               UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
```

```
CALIFORNIA VALLEY MIWOK TRIBE,    :
                                  :
          Plaintiff,              :
                                  :
     v.                           :  Civil Action No. 05-0739 (JR)
                                  :
USA, et al.,                      :
                                  :
          Defendants.             :
```

**MEMORANDUM**

The California Valley Miwok Tribe, an Indian tribe "recognized and eligible for funding and services" pursuant to Section 104 of the Act of November 2, 1994, Pub. L. 103-454, 108 Stat. 4791, see 70 FR 71194, seeks declaratory and injunctive relief against what it calls federal government interference with its internal affairs.  The government moves to dismiss for failure to state a claim upon which relief can be granted.  Dkt. #15-1.  For the reasons set forth below, the government's motion to dismiss [Dkt. #15-1] will be granted.

1.   **Background**

In 1915, a federal Indian Agent located a cluster of thirteen Miwork living on 160 acres in or near the city of Sheep Ranch, California.  Dkt. #18-1 at 3.  The government purchased two of the 160 acres, in trust for the Miwok, in April 1916.  The two-acre parcel came to be known as "Sheep Ranch Rancheria."  The number of people living there dwindled, to the point that, when

the 1934 Indian Reorganization Act, 25 U.S.C. §§ 461-479, was adopted, the government recognized only one individual as a Tribe member.  Dkt. #18-1 at 4.

In 1965, the government (i.e., the Bureau of Indian Affairs - BIA) began investigating the possibility, under the federal legislation known as the Rancheria Act, of terminating the Sheep Ranch Rancheria of Miwok Indians.  P. L. 85-671, 72 Stat. 619; amended by P.L. 88-419, 78 Stat. 390.[1]  A December 30, 1965 list, prepared pursuant to the Rancheria Act, named Mabel Hodge Dixie as the only Indian living on Sheep Ranch.  Id.  In 1966, finding no evidence that Lena Shelton, her brother Tom Hodge, her daughter Dora Shelton Mata or her two granddaughters had ever lived on the Rancheria, the government denied their claims to membership in the Tribe, conveyed Sheep Ranch to Mabel Dixie by deed, and terminated the Tribe.  Id. at 5.

In 1994, Congress enacted the Federally Recognized Indian Tribe List Act of 1994, Pub. Law 103-454, and the Tribe's name was placed on the list of federally recognized tribes. Dkt. #18-1 at 8.  On September 24, 1998, the Superintendent of the

---

[1]  The Rancheria Act terminated federal supervision in the State of California, and the Department of the Interior oversaw the distribution of the land and assets involved in the termination.  As a result, numerous Indian land parcels in California passed out of federal ownership and were no longer held in trust for the tribes by the United States Government. See http://www.nigc.gov/nigc/documents/land/drake.jsp.

Bureau of Indian Affairs Central California Agency (BIA CCA) advised Yakima Dixie, as tribal chairman, that Yakima Dixie, Melvin Dixie, Silvia Burley,[2] Rashel Reznor, Anjelica Paulk, and Tristan Wallace "possess[ed] the right to participate in the initial organization of the Tribe." Id.  The BIA letter recommended a general council form of government for the initial organization process.  On November 5, 1998, by Resolution #GC-98-01, the Tribe established the tribal council.  Dkt. #1 at 5.

On April 20, 1999, for reasons not explained in the record, Yakima Dixie resigned as tribal chairman.  Dkt. #18-1 at 8.  On May 8, 1999, the Tribe held a general election.  Yakima Dixie participated in the unanimous vote to elect Silvia Burley as chairperson and to ratify the Tribe's constitution.  Subsequently, he participated in several more tribal council meetings and signed several documents as vice-chairman.  Dkt. #18 at 8-9.  On June 25, 1999, the BIA CCA recognized Silvia Burley as tribal chairperson.  Id. at 9.

---

[2]    The relationship between Yakima Dixie and Silvia Burley is explained only by Mr. Dixie, a proposed intervenor whose motion to intervene is mooted by this decision.  He alleges that he is the son of Mabel Hodge Dixie and the putative hereditary chief of the Tribe and BIA-recognized tribal representative, and that he was approached by Silvia Burley in 1996.  Ms. Burley was a distant relative who was "tribeless."  Dkt. #19 at 5.  She asked that he give her and her daughters tribal status so that they could receive educational and medical benefits from the government.  Mr. Dixie agreed.  Id.

On July 20, 1999, the Secretary of the Interior and the Tribe entered into a "self-determination contract" that would provide funding for tribal government activities, and, on September 30, 1999, the Tribe became a "contracting Tribe" pursuant to the Indian Self Determination Act, PL 93-638.  Dkt. #18-1 at 9.  On October 9, 1999, the Tribe adopted an "Interim Operations Authorities and Rights Resolution."  Dkt. #1 at 5.

At some time in late 1999, a leadership dispute developed within the Tribe.  Apparently[3] responding to an inquiry by vice-chairperson Yakima Dixie, the superintendent of the BIA CCA office wrote on February 4, 2000 that only Tribe members over the age of 19 (Mr. Dixie, Silvia Burley, and Rashel Reznor) were entitled to participate in the organization of the Tribe, and that all issues involving tribal leadership were internal matters to be resolved by the Tribe.  Dkt. #1 at 5.

Yakima Dixie apparently then made a complaint within the Tribe about his removal from tribal leadership.  On February, the Tribal Council notified him that he had 30 days to initiate a review of his claims regarding his resignation.  There is no record of a timely response.  Dkt. #1 at 5.

On March 6, 2000, the Tribe ratified its Constitution. A March 7, 2000 letter from the Superintendent of the BIA CCA to

---

[3]   The word "apparently," which appears more than once in this opinion, reflects the state of the record.

Silvia Burley indicated that, as of that date, the BIA believed the Tribe's General Council to consist of Mr. Dixie, Ms. Burley, and Ms. Reznor, and stated that the leadership dispute between Mr. Dixie and Ms. Burley was an internal tribal matter. The BIA informed the tribe that the appropriate forum for resolving the tribal leadership dispute was the Tribal General Council, and that, generally, the rights of others to participate in the governance of the Tribe should be determined by the appropriate Tribal Forum. The BIA stated that, as a matter of federal law and policy, there was no basis for agency involvement in the leadership dispute. Dkt. #1 at 6.

The Tribe then requested that the BIA CCA review the Tribe's Constitution, and that the BIA CCA set up a secretarial election, pursuant to the Indian Reorganization Act, 25 U.S.C. § 476, so that the Tribe could become fully "organized" under federal law. On March 9, 2000, the BIA CCA acknowledged receipt of the Tribe's requests. Under the Act, the BIA CCA was required to conduct the requested election no later than 180 days after the Tribe's request. In this case, that time period would have ended on September 7, 2000 – 180 days after the BIA's acknowledgment letter. Dkt. #1 at 6.

On March 16, 2000, the Tribe passed a resolution that Yakima Dixie had waived his right to contest his resignation as Tribal chairperson by failing to respond to the February 9

notice.  Dkt. #1 at 6.  A July 12, 2000 letter from the BIA CCA to Ms. Burley recognized her as chairperson of the Tribe, with the vice chairperson seat empty and Ms. Reznor as the secretary/treasurer.  Dkt. #1 at 6.

On June 7, 2001, when the BIA CCA had not conducted the secretarial election that should have been done nine months earlier, Ms. Burley withdrew the Tribe's request.  Dkt. #15-1 at 6.  On July 18, 2001, Yakima Dixie sued the Tribe in the Eastern District of California challenging its membership and leadership.  (The suit was dismissed in 2002.)  Dkt. #15-1 at 11.

Up to this point, the confusion that surrounded the Miwok Tribe seems attributable to internecine squabbling among a very small group of people.  Now, however, the BIA became active, and its activity multiplied the confusion.  In September 2001, the Tribe adopted a new version of its constitution, and sent it to the BIA CCA.  On October 31, 2001, the BIA acknowledged receipt of the Tribe's new constitution, but did not approve it, stating:

> The Agency will continue to recognize the Tribe *as an unorganized Tribe* and its elected official *as an interim Tribal Council* until the Tribe takes the necessary steps to complete the Secretarial election process.

Dkt. #18-1 at 10 (emphasis added).  (A few months later, however, the BIA CCA advised Ms. Burley that the provision in the Tribe's PL 93-638 contract requiring the tribe to develop a tribal constitution subject to the IRA's process would be deleted until

- 6 -

an official opinion supporting that requirement was issued.  No such opinion has been issued.)  In November 2003, the BIA acknowledged the existence a "government-to-government relationship" with the Tribe through the tribal council that Ms. Burley chaired.  In January 2004, the BIA CCA granted the Tribe "Mature Contract Status" with the federal government, Dkt. #18-1 at 10.  In February 2004, the Tribe provided a new copy of its Constitution to the BIA, not for review, but only for the BIA's records.

Enter the Native American Technical Corrections Act of 2004.  Enacted in March 2004, the statute added a new subsection (h) to Section 16 of IRA.  26 U.S.C. § 476(h).  Subsection (h) states:

> (h) Tribal sovereignty. Notwithstanding any other provision of this Act–
>
>> (1) each Indian tribe shall retain inherent sovereign power to adopt governing documents under procedures other than those specified in this section; and
>>
>> (2) nothing in this Act invalidates any constitution or other governing document adopted by an Indian tribe after June 18, 1934, in accordance with the authority described in paragraph (1).

Almost immediately after the enactment of subsection 476(h), on March 26, 2004, for reasons unexplained in the record, the BIA advised the Tribe by letter that it still considered the Tribe to be unorganized, and that the Tribe should only draft

governing documents "after the greater tribal community is initially identified ... [so that] the Tribe's base and membership criteria [are] identified."  Letter of March 26, 2004; Dkt. #1 at 9-10.  That letter recognized Silvia Burley only as "a person of authority," not the head of an organized tribe.

On February 11, 2005, the Acting Assistant Secretary for Indian Affairs dismissed (as untimely) an administrative appeal that Yakima Dixie had filed more than two years earlier.  The dismissal decision letter stated:

- that the BIA had rejected the Tribe's constitution;
- that the BIA did not recognize Silvia Burley as Tribal Chairperson, but as a "person of authority" within the Tribe;
- that the BIA would not recognize anyone as the Tribal Chairperson until the tribe had organized as described in the March 26, 2004 letter; and
- that the BIA did not recognize the tribal hearing process as a legitimate tribal forum.

Dkt. #18-1 at 11.  It is this letter that plaintiffs now assert constituted final agency action, reviewable under the APA.

In March 2005, BIA CCA convened a series of meetings, attended by Mr. Dixie, his tribal consultants, attorneys, and prospective tribal members, and representatives of Ms. Burley (who did not participate in person).  The principal subjects discussed were the identification of putative members of the Tribe; the organizational methods that the Tribe should be considering; Yakima Dixie's concerns about the current leadership's use of government PL 93-638 contract funds; and the

- 8 -

Burley faction's use of non-gaming revenues.  Dkt. #31-1 at 3. The meetings did not resolve the Tribe's leadership disputes, and, on August 30, 2005, the Tribe "disenrolled" Yakima Dixie.

On July 19, 2005, the BIA, acting upon its February 11 letter, unilaterally suspended the Tribe's federal contract. Dkt. #29-1 at 10.  On August 4, 2005, the California Gambling Control Commission notified the Tribe that it would be withholding distributions from the California Revenue Sharing Trust Fund until such time as the tribal leadership was firmly established.[4]  Dkt. #18-1 at 12.  On August 19, 2005, the BIA again modified the Tribe's contract, only partially revoking the July changes.

On October 26, 2005, Raymond Fry, BIA CCA Tribal Operations Officer, returned a tribal resolution to Ms. Burley without having taken the action requested in the resolution, asserting that there was no "government-to-government" relationship with the California Valley Miwok.  On December 5, 2005, the BIA ratified Mr. Fry's position.  Dkt. #29-1 at 9. That same day, the Tribe received notice that the State of

---

[4]   The California Indian Gambling Revenue Sharing Trust Fund provides fixed payments, on a quarterly basis, to non-gaming tribes within the state of California.  Each non-gaming tribe receives $1.1 million per year, distributed on a quarterly basis. In the event that the fund has insufficient monies to make payments in that amount, available funds are distributed to the tribes in equal shares, on a per-tribe basis.  See http://www.cgcc.ca.gov/rstfi/funddist.pdf.

California had filed an interpleader in California Superior Court in order to determine the Tribe's leadership for Trust Fund payment purposes.  Id. at 10.

2. **The Complaint**

The Tribe alleges that, at least since June 25, 1999, the BIA has recognized its government, its documents, and its chairperson, Silvia Burley, and that the BIA is now trying to reverse that position.  The Tribe seeks declaratory and injunctive relief affirming that it possesses the "inherent authority" to adopt the governing documents outside of the Indian Reorganization Act, pursuant to 25 U.S.C. § 476(h); that the documents the Tribe has adopted are valid, governing documents; and that the Tribe has lawfully organized pursuant to its inherent sovereign authority.  The plaintiffs argue that the letter from the Acting Assistant Secretary for Indian Affairs to Yakima Dixie on February 11, 2005 was, under 25 C.F.R. § 2.6(c), "final for the department, and effective immediately," and thus reviewable in this court under the APA as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706.[5]

---

[5]  For the purposes of this opinion only, the court accepts that the letters of February 11, 2005 and March 26, 2004 were final agency actions.

3.  **Analysis**

Congress has delegated to the Secretary of the Interior broad authority over "public business relating to ... Indians." 43 U.S.C. § 1457.[6] At the core of this authority is a responsibility to ensure that Secretary deals only with a tribal government that actually represents the members of a tribe. As early as 1942, when the government still held lands in trust for many tribes, the Supreme Court stated that the Department had a duty to conduct business only with lawfully-constituted governing bodies who represent the tribal membership.

> In carrying out its treaty obligations with the Indian tribes, the Government ... has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards. Payment of funds at the request of a tribal council which, to the knowledge of the Government officers charged with the administration of Indian affairs and the disbursement of funds to satisfy treaty obligations, was composed of representatives faithless to their own people ... would be a clear breach of the Government's fiduciary obligation.

Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942).

The IRA charges the Secretary, broadly, with supervising tribal elections and ensuring their fundamental integrity, Shakopee Mdewakanton Sioux (Dakota) Community v. Babbitt, 107 F.3d 667, 670 (8th Cir. 1997), and sections of the

---

[6]  In turn, the Secretary has delegated this responsibility to the BIA and the Principal Deputy Assistant Secretary - Indian Affairs. Dkt. #18-12 at 1.

IRA require that tribal actions reflect the will of a majority of the tribal community – whether or not they choose to organize under the IRA procedures.  See 25 U.S.C. §§ 476(a)(1), 478.  The fair and full participation of tribal members is critical to the legitimacy of any constitutional reform.  Morris v. Andrus, 640 F.2d 404, 415 (D.C. Cir. 1981).  A judge of this court has chastised the Department of the Interior when it was "derelict in [its] responsibility to ensure that the Tribe make its own determination about its government consistent with the will of the Tribe."  Ransom v. Babbitt, 69 F. Supp. 2d 141, 153 (D.D.C. 1999).

In plaintiffs' submission, subsection 476(h) was added to free Indian tribes from the onerous organization requirements BIA had put in place to implement § 476(a)-(g).  BIA's response, however, is that while subsection 476(h) does give Indian tribes more procedural flexibility, it does not relieve BIA of the duty to ensure that the interests of all tribe members are protected during organization and that governing documents reflect the will of a majority of the Tribe's members.  BIA thus defends its refusal to recognize the California Valley Miwok Tribe as an organized tribe on the ground that the Tribe has failed to take necessary steps to protect the interests of its potential members.  Dkt. #15-1 at 28.

The legislative history of subsection 476(h) is limited, see Dkt #15-1 at 25, and of considerably less help than the canons of statutory interpretation. A statute is to be read as a whole, Massachusetts v. Morash, 490 U.S. 107, 115 (1989), since the meaning of statutory language, plain or not, depends on context, King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991). Courts presume that Congress knows the law when it enacts a statute, Garrett v. United States, 471 U.S. 773, 793-94 (1985). When a specific section and a general section conflict, the specific section controls; courts "must be 'reluctant to treat statutory terms as surplusage' in any setting," Duncan v. Walker, 533 U.S. 167, 174 (2001) (internal citation omitted).

These rules teach that subsection 476(h)'s references to documents adopted by a tribe must be understood as references to documents that have been "ratified by a majority vote of the adult members," as required by subsection 476(a). Subsection 476(h) did not repeal the provisions of subsection 476(a), nor will it be construed to repeal or water down the protections afforded by the IRA when tribes organize: notice, a defined process, and minimum levels of tribal participation.[7]

---

[7] The factual subtext of this litigation illuminates the importance of these protections. At the inception of this suit, Ms. Burley and her two daughters were seeking approval of a tribal constitution that conferred tribal membership upon only them and their descendants. See Dkt. #15-1 at 5. The Tribe received approximately $400,000 in federal funds last year, and could receive $600,000 this year. Because the Tribe is also a

4.      **Conclusion**

Plaintiffs's claim of government interference in the internal affairs of the Tribe depends entirely on their reading of subsection 476(h), which, as I have explained, is erroneous. The first count of plaintiffs' complaint, asserting a "violation" of 25 U.S.C. § 476(h), thus fails to state a claim upon which relief can be granted. The second count, asserting arbitrary, capricious, or unlawful agency action under the Administrative Procedure Act, also depends upon plaintiffs' reading of subsection 476(h) – nothing arbitrary or capricious has been pointed to in the briefs – and also fails to state a claim.[8] The additional counts added by plaintiffs' proposed second supplemental complaint, Dkt. #34-2, are derivative of plaintiffs'

---

non-gaming California tribe, the California Gambling Control Commission, a state agency, makes additional payments to the tribe from the California Revenue Sharing Trust Fund (CRSTF). Dkt. #18-5; Dkt. #18-9.  CRSTF payments are made on a per-tribe basis – the amount does not change based on the number of tribe members – and amounted to about $1 million last year. The Tribe now proposes a revised constitution that includes non-Burley descendants, and it has submitted a list of 29 possible members, but the government estimates that the greater tribal community, which should be included in the organization process, may exceed 250 members. See Dkt. #15-2 at 2. As H.L. Mencken is said to have said: "When someone says it's not about the money, it's about the money."

[8]     The government's motion is to dismiss for lack of jurisdiction or failure to state a claim. Dkt. #15-1. Summary judgment would be available on plaintiff's APA claim, see, e.g., Judicial Watch, Inc. v. United States Dep't of Commerce, 34 F. Supp. 2d 28, 46 (D.D.C. 1998), but, since the only issue being decided is one of statutory interpretation, dismissal is appropriate.

subsection 476(h) theory and would also fail to state a claim if leave to file them were granted.[9]  Defendant's motion to dismiss will be **granted**.

```
                                  JAMES ROBERTSON
                            United States District Judge
```

---

[9]    Leave to file will be denied.